THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 28, 2018

**STATE OF TENNESSEE v. THOMAS CLINTON WOOD**

**Appeal from the Criminal Court for Putnam County**
**No. 2016-CR-567   Gary McKenzie, Judge**

_____

**No. M2017-02483-CCA-R3-CD**

_____

Defendant, Thomas Clinton Wood, was indicted by the Putnam County Grand Jury for one count of aggravated assault with a deadly weapon. Following a jury trial, Defendant was convicted as charged and sentenced by the trial court to three years in confinement as a Range I standard offender. On appeal, Defendant contends that the evidence was insufficient to support his conviction for aggravated assault, and that the trial court erred by denying alternative sentencing. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Craig P. Fickling, District Public Defender; and Allison R. West and Ellie Putnam, Assistant Public Defenders, Cookeville, Tennessee, for the appellant, Thomas Clinton Wood.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Victor H. Gernt III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

On April 2, 2016, Sergeant Roy Phipps of the Algood Police Department responded to a dispatch of a stabbing at a party on Quinland Lake Road. There were numerous people outside when he arrived at the residence. He had been given the name

of a suspect, and he was looking for the individual. Sergeant Phipps was approached by a couple of witnesses who indicated that the suspect was around the back of the house, and the victim, Jamie Brown, was inside the house. As Sergeant Phipps was walking to the back of the house he heard a "commotion" in the front yard. The two witnesses pointed out Defendant, who was yelling and screaming, as the suspect in the stabbing. Defendant was with a woman, who was later identified as Defendant's wife, April Wood, and they moved to the opposite corner of the house as Sergeant Phipps approached them. Sergeant Phipps told Defendant to stop a couple of times, and Defendant eventually complied.

Sergeant Phipps noted that Defendant appeared to be intoxicated and was very upset. Due to the nature of the call, Sergeant Phipps placed Defendant in handcuffs. Defendant said that he had been "jumped" or "assaulted." Defendant repeatedly said that he was not going to be "picked up and throwed down like no bitch." The encounter with Defendant was recorded on Sergeant Phipps' body camera, and the footage was shown to the jury. Sergeant Phipps waited for additional officers to arrive, and he and Deputy Cobble made contact with the victim who was sitting in a chair in the kitchen. The victim had wounds to his arm and face, and he was covered in blood. Sergeant Phipps then walked back outside and placed Defendant in his patrol car. He assisted other officers in looking for the knife used in the offense, and Defendant's wife eventually brought it to him. Sergeant Phipps noted that the weapon was a "single blade, locked blade, flip open, spring-assisted open knife."

Marty Reed, owner of the residence, testified that on April 2, 2016, she was hosting a party for her son Jacob's twenty-first birthday. Approximately twenty to thirty people, including children, were there. Adults at the party were drinking alcoholic beverages. Ms. Reed testified that Defendant is her brother-in-law, and the victim is her cousin. She said that Defendant and the victim were discussing an altercation that the two men had on a houseboat ten to twelve years in the past. Ms. Reed testified that the two men at first laughed about it, but then Defendant became aggravated. Ms. Reed's sister later told her that Defendant was being an "ass." She then found Defendant sitting in the dark in a den near the kitchen. Ms. Reed asked Defendant what was wrong, and he said that he was "gathering" his thoughts. She asked Defendant if there was a problem, and he said, "I'm tired of [the victim] running his mouth about blacking my eye ten years ago, and I don't want to hear it anymore. And I've got the keys to his truck, and in the morning, we're going to go for a drive, and I'll go out in the woods, and I will kill him." Ms. Reed told Defendant that he was not going to cause a scene at the party, and she asked him for the victim's keys. Defendant refused and in a raised voice said, "No, you're not getting the keys. [The victim] and I will go for a drive in the morning." Ms. Reed again told Defendant not to start anything and that she would call police if he caused any trouble. Defendant responded loudly, "Call the cops, Marty, I don't care."

Ms. Reed left the room to allow Defendant to calm down. She told the victim's girlfriend that Defendant had the victim's keys and would not give them to her. They

- 2 -

both walked out to the victim's truck and found that it had been "completely ransacked," and the keys were missing. Ms. Reed and the victim's girlfriend continued around house, and Ms. Reed saw the victim walking around the house "like he had been to the vehicle, and was going back to the back yard." They followed the victim and saw him walk upon the back deck where Defendant was bent over the cooler getting a beverage. When Defendant raised up, the victim said, "Give me my keys." Ms. Reed testified that Defendant told the victim that he was not getting his keys, and he punched the victim in the face with a closed fist. The victim then grabbed Defendant and took him to the ground. Ms. Reed testified that she did not see the victim's hands on Defendant's throat. She ran to get help and heard something like, "I'm cut or "he's cut." She did not see Defendant pull out a knife.

Ms. Reed testified that she told her husband that Defendant and the victim were fighting and that he needed to do something. She then saw Defendant chasing the victim around the fire pit with a knife in his hand. The victim was using a plastic chair to keep Defendant away from him. Ms. Reed testified that the victim had a "very bad cut," and he was eventually taken into the house because he began to pass out from the loss of blood. She said that someone at the party had already dialed 9-1-1, and she gave the phone to Ms. Reed to give them her address. Ms. Reed testified that the doors were locked, and her husband, niece and others rendered aid to the victim until police and an ambulance arrived. She thought that the victim had two to three beers while at the party. Ms. Reed testified that she eventually found the victim's keys on top of a curio cabinet in the den where Defendant had been sitting.

Kimberly Snook, the victim's girlfriend, testified that she was with the victim at the party on April 2, 2016. She noted that it had been approximately ten years since she and the victim had seen Defendant. Ms. Snook testified that Defendant appeared to be teasing the victim about an incident that occurred ten years prior, and it continued throughout the evening. Defendant indicated that the victim had "blacked" his eye. She said that the victim had a couple of drinks, but he did not drink excessively because he planned to drive home to Ohio after the party. Ms. Snook testified that she and the victim tried to avoid Defendant but he attempted to push the victim's face into the birthday cake when it was cut.

At some point, Ms. Reed advised Ms. Snook that Defendant had taken the victim's keys which the victim had left in his vehicle. Ms. Snook decided that she would attempt to diffuse the situation and that she and the victim would just spend the night at Ms. Reed's house. She thought that they would deal with the key situation in the morning because Defendant seemed to be intoxicated. Ms. Snook went outside to tell the victim of the plan to spend the night, and she discovered that the victim's vehicle had been ransacked, and the contents of the vehicle were "strew[n] about everywhere."

Ms. Snook testified that she told the victim that Defendant had his keys and that Ms. Reed did not "want there to be a fight or anything." The victim immediately walked around to the back of the house and onto the deck where Defendant was standing. Ms. Snook testified: "When he went around back, he says, '[Defendant], give me my keys.' And so - - and, um, [Defendant] says, 'Don't you come up on me like that.' And he lunged towards [the victim]. I - - I was standing behind them somewhat." Ms. Snook testified that the victim then took Defendant to the ground and was on top of Defendant. She did not see the victim punch or choke Defendant. She said that the victim was holding Defendant down on the ground. At some point, the victim stood up and said, "You cut me. You cut me." Ms. Snook testified that the victim backed up and got down off the deck. She said that the victim walked toward the bonfire, and Defendant "just keeps coming after him. He just keeps on and on." Defendant chased the victim around the bonfire and at one point said, "I'm going to kill you. I'm going to kill you." The victim eventually picked up a plastic chair and hit Defendant with it. Ms. Snook testified that the chair "disintegrated," and Defendant "just kept coming." She said that the two men were eventually separated, the victim was taken inside the house, and the doors were locked to keep Defendant out.

Derrick Keith Harvey is a friend of Jacob Reed and attended Mr. Reed's 21st birthday party. While in the kitchen, Mr. Harvey heard a commotion going on outside. He turned around and saw two men arguing. He observed Defendant swing his fist, and the victim grabbed Defendant's arms and took him to the ground. Mr. Harvey testified that the victim was holding Defendant down "just trying to get him to stop." He said that Defendant pulled a knife out and tried to "stab towards" the victim. Mr. Harvey testified that Defendant struck the victim in the arm and then in the face with the knife. He recalled that Defendant "was trying to get to [the victim], and [the victim] was just trying to stop the situation."

Mr. Harvey testified that he went outside, and Defendant and the victim were out in the yard. Defendant was still "charging after" the victim, and at one point, the victim threw a chair at Defendant. Mr. Harvey testified that he helped the victim, who was injured, get inside the house. Defendant tried to get into the house through the front door and said, "I'm not done with him."

The victim, Jamie Brown, testified that he is Ms. Reed's cousin, and he and Ms. Snook traveled from Dayton, Ohio to attend the birthday party. The victim testified that he had not seen Defendant, who was also at the party, in approximately ten years. He said that Defendant kept bringing up the past and "taking little jabs and pokes" at the victim. According to the victim, Defendant was angry because the victim had shot Defendant in the eye with a squirt gun ten years earlier. The victim noted that Defendant was joking about it at first, but he then tried to shove the victim into the birthday cake while the candles were being blown out. The victim "blew it off" and attempted to avoid Defendant.

The victim testified that he walked out to his truck and found that it had been ransacked. He said that everything that had been in the truck was lying on the ground. The victim noticed that his keys were missing, and Ms. Reed and Ms. Snook told him that Defendant had them. The victim testified that he walked up to Defendant, who was standing on the deck, and said, "[Defendant], give me my keys." Defendant responded: "Boy, if you come up on me like that again, I'll kill you." Defendant then punched the victim on the side of the face. Although Defendant had a cane, he was not holding it at the time. The victim testified that he grabbed Defendant and took him down to the ground. He saw Defendant pull something out of his right hand, and Defendant cut the victim's arm. The victim stood up and said, "You cut me. . ." Defendant then cut the side of the victim's face. The victim testified that he did not grab Defendant's throat, choke him, or punch him. He also said that he did not touch Defendant before Defendant hit him.

On cross-examination, the victim agreed that he told the officer at the hospital that he grabbed Defendant by the Adam's apple and "power slammed" him to the ground after Defendant punched him. However, the victim explained that he was defending himself and that he took Defendant to the ground to make him stop. He stood up when Defendant cut him. The victim testified: "I power slammed him to the ground, and I put my knee on his chest. And then I told him to cool out, and that's when he pulled the knife out." The victim recalled having two and a half beers at the birthday party.

The victim testified that he ran out into the yard to get away, but Defendant chased him. The victim grabbed a plastic chair close to the fire pit to keep Defendant away from him, and he walked around the campfire to keep distance between himself and Defendant. Defendant, while holding the knife, continued to yell that he was going to kill the victim. Someone finally stopped Defendant, and the victim was taken inside the house. He was later taken to the hospital for treatment.

April Wood, Defendant's wife, testified that Ms. Reed is her sister, and she and Defendant attended her nephew's birthday party at Ms. Reed's house. Ms. Wood testified that there was "[q]uite a bit" of alcohol at the party, and most of the adults were drinking. She said that the cake was brought out, and her nephew, her nephew's father, and the victim stood next to it for a picture. Ms. Wood testified that Defendant thought it would be funny to push the three men's faces into the cake, which was decorated like a woman wearing a corset. She could not say if all three of their noses touched the cake, but Defendant was "aiming" for all three of them. The victim took Defendant's behavior as a joke.

Ms. Wood testified that she did not see the victim later approach Defendant on the deck. The victim was already lying on the ground when she walked outside, and the victim was on top of him with one of his hands on Defendant's throat. She said that two

men were trying to get the victim off Defendant, and Defendant told the victim, "Jamie, let go. Jamie, stop. You're choking me. Let go." Ms. Wood testified that she saw Ms. Reed approach the men but she told Ms. Reed to stay back because Defendant had a knife. Ms. Wood claimed that she never saw Defendant chase the victim but she saw the victim throw a plastic chair at Defendant. She said that she asked Defendant for the knife, but he responded, "No not as long as he's throwing at me, I'm not going to." Ms. Wood later retrieved the knife from Defendant and gave it to police.

When asked about Defendant's medical condition, Ms. Wood testified:

> [Defendant] has a lot of medical problems. He's got several, um, herniated discs, several bulging discs in his back. He also, at that time, had been in a car accident, about three weeks prior. And he had six fractured ribs and a fractured sternum, which is this area here, where when he and his brother had a car accident, he went forward, and the steering wheel hit him there and bent him forward like that.

She said that Defendant always walked with a cane, and he was walking with the cane while at the party. Ms. Wood did not see the cane during the altercation between Defendant and the victim, but she later found it between the deck steps and the air conditioning unit. She said that Defendant's lighter and hat were strewn on the porch, and she picked them up and put them together.

Defendant testified that he took the victim's keys because the victim had been drinking, and he was afraid that the victim would drive. He said:

> And I told [Ms. Reed], I said, "I've got [the victim's] keys." She said, "You ought to give them back to him." I said, "I'm going to put them right up here." Everybody went away, and I started out the back door to get a beer, and I bent over the cooler to get one, and [the victim] come [sic] out of the dark and grabbed me right by the throat and throwed [sic] me backwards off the step.

Defendant testified that the victim said, "Give me my damn keys," and Defendant said that he denied having the victim's keys. Defendant testified that the victim's hand was on his throat, and the victim was choking him. Defendant said that he was holding his cane when the victim approached him, and he denied punching the victim. He also testified that he did not threaten to kill the victim when the victim approached him.

Defendant testified that he pulled his knife out because he was afraid for his safety. He claimed that he only "wanted to poke [the victim] a little" in the arm to make him let go and that he did not want to cut the victim. Defendant testified that "when I poked him they pulled him off, and it cut him bad." He said that his lighter fell out of his

pocket, his hat was thrown off when he hit the deck, and his cane fell out of his hand. They were later picked up by "Donna" and placed together.

On cross-examination, Defendant testified that he accidently cut the victim with the knife. He said that during the altercation, the victim was crushing Defendant's Adam's apple and that it was "probably a week" before he could "talk right." However, he agreed that the video footage from Sergeant Phipps' body camera showed that he was shouting after the altercation. The video footage also showed that Defendant did not initially tell Sergeant Phipps that the victim was choking him. He only said that the victim grabbed him by the throat and threw him down. Defendant said that he later told Sergeant Phipps that the victim was choking him. He also told Sergeant Phipps that he did not have the victim's keys because he had put the keys up in the house. Defendant denied ransacking the victim's vehicle. He had no idea how the victim's belongings got into the yard. Defendant testified that he reached through the window and took the keys out of the vehicle. He admitted that he did not have permission to take the keys.

Defendant testified that he did not know anything about a story involving the victim and a water gun. He said that the victim was telling "people that he blacked my eye years ago. I remember us being in a little towel fight, and we was pulling the towel, and my hand slipped right there and poked myself in the eye." Defendant denied complaining about the incident, and he did not tell Ms. Reed that he was tired of the victim "running his mouth." He said that he got away from the victim. Defendant denied telling Ms. Reed that he and the victim were going for a ride the following day, and he said that Ms. Reed was lying. Defendant said that he told Ms. Reed that he had the victim's keys, and he told her where he put them.

Defendant testified that there was no commotion before the victim walked up on the deck and grabbed him and threw him to the ground. He denied punching the victim or threatening to kill him before the victim grabbed him. Defendant testified that all of the witnesses made up the fact that he punched the victim. He denied chasing the victim to the fire pit, and he said that the victim hit him with a chair. When asked if he continued to pursue the victim after he was cut, Defendant replied, "A couple of steps." Defendant said that he still had the knife in his hand but it was closed. Defendant denied looking for the victim to continue the fight after the victim had been taken inside the house. When asked if it was him on the video footage from Sergeant Phipps' body camera shouting, "Where is he?," Defendant replied, "I don't know. I don't know."

*Analysis*

## I. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his conviction for aggravated assault and that the trial court erred in not granting his motion for judgment of

acquittal. In response, the State contends that the proof was sufficient for the jury to find Defendant guilty of aggravated assault and that the trial court's judgment should be affirmed.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

On appeal, a jury conviction removes the presumption of innocence and replaces it with one of guilt, so that the defendant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As is relevant to this case, aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault . . . and the assault . . .[i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). A person commits assault who "intentionally, knowingly, or recklessly causes bodily injury to another." T.C.A. § 39-13-101(a)(1).

Concerning self-defense, Tennessee Code Annotated section 39-11-611(b)(1) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree

the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

The use of force likely to cause death or serious bodily injury may be justified when a person (1) "has a reasonable belief that there is imminent danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." T.C.A. § 39-11-611(b)(2). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). If the jury finds that the defendant acted in self-defense, it is a complete defense to crimes of violence. *Id.*

Viewing the evidence in this case in a light most favorable to the State, the proof shows that Defendant and the victim were at a birthday party, and Defendant became upset with the victim over an incident that occurred between the two men ten years earlier. According to the testimony, Defendant kept bringing up the incident throughout the night, and the victim attempted to avoid Defendant. When it came time to cut the birthday cake, Defendant attempted to shove the victim's head into the cake, purportedly as a joke. At one point, Ms. Reed found Defendant alone in a dark room in the house. He told Ms. Reed, "I'm tired of [the victim] running his mouth about blacking my eye ten years ago, and I don't want to hear it anymore. And I've got the keys to his truck, and in the morning, we're going to go for a drive, and I'll go out in the woods, and I will kill him." Ms. Reed told Defendant that he was not going to cause a scene at the party, and she asked him for the victim's keys. Defendant refused and in a raised voice said, "No, you're not getting the keys. [The victim] and I will go for a drive in the morning." Ms. Reed told Defendant not to cause any trouble, and she threatened to call police, but Defendant said that he did not care.

Ms. Reed and Ms. Snook later found that the victim's vehicle had been ransacked, and his keys were missing. The contents of the vehicle were scattered on the ground. They told the victim that Defendant had taken his keys, and he approached Defendant on the back deck of the house and asked for the keys. The victim testified that Defendant said, "Boy, if you come up on me like that again, I'll kill you." Defendant then lunged toward the victim and punched him on the side of the face. The victim testified that he took Defendant to the ground. The victim said that he did not punch or choke Defendant, and Ms. Reed and Ms. Snook testified that they did not see the victim punch or choke Defendant. He held Defendant down to make him stop. Mr. Harvey testified he observed Defendant swing his fist at the victim, and the victim grabbed Defendant's arm and took him to the ground. Mr. Harvey further testified that the victim was holding Defendant down "just trying to get him to stop." At that point, Defendant pulled out a

knife and cut the victim on the arm. The victim stood up and said, "You cut me. You cut me." Defendant then cut the victim on the face.

The victim got up and tried to get away from Defendant, but Defendant chased him into the yard and around the fire pit while still holding the knife. At one point, the victim used a plastic chair to keep Defendant away from him, but Defendant kept going toward him. According to the testimony, Defendant continued to yell that he was going to kill the victim. The victim, who had lost a large amount of blood and nearly passed out, was eventually taken inside the house, and Defendant was locked outside. Mr. Harvey testified that Defendant tried to get into the house through the front door and said, "I'm not done with him." When Sergeant Phipps arrived on the scene, Defendant was still yelling and screaming. He told Sergeant Phipps that he was not going to be "picked up and throwed [sic] down like no bitch." The victim suffered wounds to his arm and face, and he was transported to the hospital by ambulance for his injuries.

Upon our review, we conclude that the evidence supports Defendant's conviction for aggravated assault. Although Defendant contends that he acted in self-defense, *see* T.C.A. § 39-11-611(b)(2)(A)-(C), the jury rejected this testimony, as was its prerogative. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). Defendant is not entitled to relief on this issue.

## II.    Sentencing

Defendant contends that the trial court erred in ordering him to serve his sentence in confinement. The State responds that the trial court did not abuse its discretion in ordering Defendant to serve his sentence in confinement. We agree with the State.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. In *State v. Caudle*, our Supreme Court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the 2005 amendments to the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and
(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court must state on the record the factors it considered and the reasons for the ordered sentence. *Id.* § 40-35-210(e); *Bise*, 380 S.W.3d at 706. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(A). However, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b) ).

When imposing a sentence of full confinement, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In addition, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

As a Range I, standard offender convicted of a Class C felony, Defendant was eligible for alternative sentencing, and he was considered a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. *See id.* § 40-35-102(6). The trial court considered the facts of this case and the appropriate sentencing principles. The trial court mainly denied Defendant's request for an alternative sentence based upon the need to protect society by restraining a defendant who had a long history of criminal conduct. The trial court also mentioned the need to avoid depreciating the seriousness of the offense and the need for deterrence. *See id.* § 40-35-103(1)(A)-(B). Defendant has not demonstrated that the trial court abused its discretion by denying him an alternative sentence.

In this case, the trial court made the following findings concerning alternative sentencing:

> Then we look at 40-35-103, and, is confinement necessary to protect society by restraining a defendant who has a long history of criminal conduct? And the State argues, I think correctly so, we've got five prior misdemeanors and a prior felony conviction. Most people go their entire lives, and everybody's heard me say this, but it's the truth, most people go their entire lives without having a single arrest, and we've got a criminal history that goes from '95, all the way up to 2016, and through our case. And that is a - - that is a long period of time that we are having consistent criminal histories: 2000, 2004, 2009, 2016. So, we've got several convictions that are occurring throughout this long period of time. And so I agree in applying that one.
>
> "Confinement is necessary to avoid depreciating the seriousness of the offense, or confinement is particularly suited to provide an effective deterrence." Well, certainly there is a seriousness of offense. This is an aggravated assault that involves certainly bodily injury, and what was testified at trial, it was significant bodily injury to the victim in the case.

- 12 -

And so I think certainly there is, an amount of confinement that would help avoid people taking lightly the aggravated assault, which is a violent crime. I think the [G]eneral makes a good, a good argument there. And a deterrence to others, certainly in this case, the deterrent value is always there, but certainly both of those apply here.

However, I think that the prong about the, "Restraining a defendant who had a long criminal history" is where the Court kind of rests its decision on."

"Measures less restrictive," I'm not, "than confinement have frequently or recently been applied," I'm not applying that. There's no evidence of any of that in here.

So I think with this criminal history, that it is time for there to be a full sentence to serve.

The record supports the trial court's findings. Although the trial court mentioned that the need to avoid depreciating the seriousness of the offense and the need for deterrence applied to Defendant's case, the trial court mostly based the denial of alternative sentencing on Defendant's long history of criminal conduct. The presentence report reflects that Defendant has one prior felony conviction for selling a Schedule II controlled substance. He also has three convictions for driving under the influence of an intoxicant (DUI) and two convictions for casual exchange. Defendant also previously violated a probationary sentence. Therefore, Defendant's prior record alone supports the denial of alternative sentencing. A trial court may deny alternative sentencing if it finds that any one of the factors found at T.C.A. § 40-35-103 apply. *State v. Christopher Allen*, No. W2016-00505-CCA-R3-CD, 2017 WL 764552, at \*4 (Tenn. Crim. App. Feb. 24, 2017); *State v. John Anthony Garrett*, No. E2012-01898-CCA-R3-CD, 2013 WL 5373156, at \*4 (Tenn. Crim. App. Sept. 23, 2013). Accordingly, the trial court did not abuse its discretion in ordering Defendant to serve his sentence in confinement.

## CONCLUSION

Finding no error, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

- 13 -